996

30 C.C.P.A.(Patents)

**BENNER et al. v. OGLESBY.**

Patent Appeal No. 4673.

Court of Customs and Patent Appeals.

Dec. 26, 1942.

George E. Stebbins, of Pittsburgh, Pa., and Albert Grobstein, of Washington, D. C., for appellants.

Cushman, Darby & Cushman, of Washington, D. C. (John J. Darby, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an interference proceeding in which there has been brought before us for review a decision of the Board of Appeals of the United States Patent Office affirming a decision of the Examiner of Interferences awarding priority of invention to appellee upon the single count in issue.

The interference involves an application of appellee, Serial No. 659,565, filed March 3, 1933, and a patent of appellants, No. 2,049,535, issued August 4, 1936 upon an application filed December 1, 1932. Appellee being the junior party has the burden of establishing priority of invention by a preponderance of the evidence.

The count reads as follows: "Apparatus for the manufacture of granular coated webs comprising means for applying liquid adhesive to a web, means whereby the partial pressure of a solvent in the atmosphere in a chamber may be controlled to prevent drying, grain applying means for applying granular particles to said adhesive coated web, and means for passing said adhesive coated web through said chamber and past said grain applying means whereby the granular material is applied to the web while the adhesive is in condition for receiving said granular material."

The involved invention relates to apparatus for coating webs with adhesive and granular material in the manufacture of sandpaper. Prior to the present invention conventional apparatus was used in the art which included means for applying liquid glue adhesive to the web and means for placing or distributing on the adhesive-coated surface granular material and means for passing the web in a continuous strip through the adhesive-applying means and then through the granule-applying means. If the distance between the adhesive-applying means and the granule-applying means was more than a very few feet the adhesive had a tendency to set, due to evaporation of the solvent from the adhesive. The granular material was prevented from being properly embedded in the adhesive if the set was too great. The invention here has for its purpose the reduction or elimination of the setting of the adhesive prior to the distribution of the granules thereon and this result is obtained by maintaining the adhesive-coated web in an atmosphere charged with a vapor of the same solvent which carries the adhesive. The adhesive-coated web as it

travels to the granule-applying means is caused to pass through a chamber in which the desired atmospheric conditions are maintained. The adhesive commonly used in making sandpaper is hide glue in water as a solvent. To keep such adhesive coat in a fluid or tacky condition the atmosphere of the chamber through which the web passes is to be charged with the same solvent which carries the glue, which solvent would be steam or other vaporous form of water.

The interference was originally declared October 18, 1938, the count being method claim 5 of appellants' patent, copied by appellee for purposes of interference. During the motion period appellants moved to dissolve the interference on the ground that the claim was not readable upon the disclosure of appellee's application. Appellee filed a motion under Patent Office Rule 109 seeking to add claims 1 and 3 of appellants' patent as additional counts in the interference. Appellee's motion was opposed by appellants in their brief on the motion to dissolve.

The Primary Examiner in his decision granted appellants' motion to dissolve and denied appellee's motion to add claim 3 but granted the motion to add claim 1 to the interference. Appellee appealed from that portion of the decision of the Primary Examiner dissolving the interference and refusing to add claim 3. The Board of Appeals affirmed the decision of the Primary Examiner in all respects. The interference was then redeclared with the present count.

Appellants in their preliminary statement alleged conception of the invention and disclosure of it to others in February 1932 and reduction to practice on June 20 of that year.

Appellee in his preliminary statement alleged that he was unable to set out any act concerning conception of the invention earlier than November 1929, at which time the first written description of the invention was made and disclosed to others. Appellee alleged that he reduced the invention to practice in or about March 1931.

Both parties took testimony.

It appears that appellee from about June 1929 was the Technical Director of the Behr-Manning Corporation, of Troy, New York, his assignee. Certain memoranda which are exhibits in this case were prepared by him November 6, 1929 and January 16, 1930, from an examination of which and appellee's testimony it is apparent that he was considering the problem of controlling the fluidity of glue in the making coat of sandpaper and that a solution of this problem was important to the production of an improved sandpaper. The improvement sought was the making of sandpaper by eliminating the conventional step of rolling the granules into the making coat, which step tended to lessen the efficiency of the abrasive surface for the reason that the granules were forced very deeply into the making coat by the rollers. The making coat in the sandpaper art is the coat of adhesive which is placed first on the web in which the abrasive granules are spread. The said memoranda suggest the use of steam in maintaining the making coat at the desired fluidity for holding the granules but do not suggest any apparatus for carrying out such step.

Appellee explained to several of his associates his idea of the kind of device which would function in the step of maintaining the making coat at proper fluidity and thus avoid the necessity of rolling the granules into the making coat. He directed them to build a chamber for experimental purposes which would enclose a substantial portion of the adhesive-coated web in its passage from the application of the adhesive to the granule applicator and so constructed that controlled amounts of steam could be injected into the chamber. The chamber also was to be equipped with heaters to control the temperature independently.

One of the witnesses for appellee testified that he received those directions and that he issued the work order for building the chamber pursuant thereto. The chamber was built accordingly. There is no contention that the chamber of appellee was not built as heretofore set out.

It appears that the Behr-Manning Corporation had in its plant several machines regularly used in making sandpaper with hide glue adhesive for the making coat, but that these machines were not suitable for use in the proposed experiment for the reason that they were closely coupled. They were so constructed that the passage between the glue-coating mechanism and the sand distributing means was very short and therefore the adhesive would remain sufficiently fluid during such short travel

as to require little or no retarding of the set of the making coat. The corporation had another abrasive machine designed for and used in making waterproof sandpaper. Varnish instead of glue was the adhesive used therein. In that machine there was a greater distance for the web to travel between the adhesive-coating means and the sand-applying means. If a glue adhesive were used on this apparatus by reason of the distance between the coating means and the sand-applying means the adhesive would have a tendency to jell or set. That machine, with glue as the adhesive, was used in appellee's experiment and was supplied with the steam chamber above referred to, placed between the coating means and the abrasive-applying means.

The machine used in appellee's experiment was not produced, but the structural details of the said steam chamber are shown in an exhibit which is a sketch prepared just prior to the taking of testimony by the witness Nelson who constructed the chamber.

The record shows that the waterproof sandpaper making machine with the chamber applied as aforesaid was used in making sandpaper in accordance with appellee's plan between March 11 and March 20, 1931. Between those dates 7466 yards of sandpaper were made, of which 1900 yards were rejected as being of inferior quality and 5565 yards were passed as being satisfactory into reamage (the number of reams contained in a package of paper) and put into stock, a small portion of which was actually sold.

The record shows that in operating the said machine the glue adhesive passing through the chamber was maintained at the desired degree of fluidity by reason of the steam charged atmosphere therein, and that the abrasive was successfully anchored upon the adhesive. There was no necessity for using the rolling step. The testimony and record of the experiment proved that without the use of steam in the chamber a satisfactory coating of abrasive could not be produced without the rolling step.

The product of the experiment was subjected to use tests concerning which there is a written report, an exhibit in the case, prepared by a witness who made the tests. According to the report the sandpaper products of the tests were compared with a third type of paper which was designated "OW1-7". As a conclusion, after setting out the results of the tests in detail it was stated in the report that the product tested was "much poorer than the standard, OW1-7." The record shows, however, that the OW1-7 paper was an electrostatically coated paper, which is a sandpaper upon which the abrasive has been spread in an electric field, by means of which process the sandpaper is more than ordinarily uniform in quality. Because of that uniformity it was considered to be useful as a control standard. A superior sandpaper as the result of the experiment would not be required to show successful reduction of the device to practice.

The apparatus claimed is illustrated by Figure 4 of appellee's application and may be described as follows:

A chamber generally of diamond shape, the top angle portion of which is more acute than the bottom angle portion. The chamber has a sand box at its apex which extends into the chamber. At the bottom of the said box a wheel and a gate is shown through which the sand descends, striking a baffle from which it is precipitated onto the moving adhesive-coated web as it passes longitudinally through the chamber from the glue-applying means. Midway on the upper walls of the structure are pipes through which steam passes into the chamber. On the side angles of the chamber are gutters to catch any condensation which may gather on the top side walls, and in the bottom of the device is another means for carrying off precipitation. Means for applying adhesive to the web is not shown in Figure 4; neither is there shown in that figure any means by which the steam is controlled.

The steam chamber portion of the device used in the experiment, as illustrated by the Nelson sketch heretofore mentioned, shows structure as follows: a chamber through which passes the adhesively coated web; glue-applying rolls; the passing of the web through the chamber into a sand box containing the sand hopper, which is situated close to the exit end of the chamber; the dropping of sand from the sand hopper onto the moving web, and the continuing of the web to the drying rack. The sketch also shows a perforated steam pipe running through the chamber, at one end of which there is a control valve and the other a petcock. The top of the chamber

shown in the sketch is substantially similar to the top of the chamber in Figure 4 and has attached to the outside thereof electric strip heaters. Under the perforated steam pipe runs a gutter to prevent condensed steam from dropping onto the adhesively coated web. It is said that the temperature and humidity of the chamber are variably governed by means of the control valve. The only differences we are able to perceive between the structure of Figure 4 and the structure shown on the sketch of the chamber used in the experiment are that the sketch shows the application of the adhesive and the valves heretofore mentioned and the electric heating strips. With respect to the heating strips the testimony is that they were used as an alternative or supplemental means for controlling the temperature and humidity in the chamber.

Romie L. Melton, one of the appellants here, testified that, with reference to Figure 4 and the portion of the specification referring thereto in the application of appellee, he found no disclosure of a means whereby partial pressure of the water vapor in the atmosphere in the chamber of Figure 4 could be controlled to prevent drying out of the glue on the web. As interpreted by that witness, the application of appellee described the introduction of steam in such quantities into the chamber of Figure 4 as to exclude all the air from the chamber. This, the witness testified, was purposely done in order to prevent the inclusion of air pockets in the adhesive film on the web. According to that witness this is not conditioning air in such quantities by means of water vapor as to bring the air slightly below the saturation point at the desired temperature. The witness further testified that, according to the application of appellee, by reason of the introduction of the steam into the chamber the atmosphere therein would become supersaturated and that under such circumstances an excess of water vapor would be deposited on the adhesive-coated web and also on the walls of the steam chest. The witness concluded that the apparatus shown in said Figure 4, if operated as described in appellee's application, could not be used to maintain the making coat of glue in proper condition. In this connection he said: "A. There would be rewetting of the glue, even glue that had not been previously dried, and the viscosity of the glue would be decreased because of dilution due to the condensation of the water vapor from the steam onto the surface of the adhesive film."

Appellee challenged the theoretical testimony of the witness Melton by a witness named Waterfield who testified that subsequent to Melton's testimony he had built an apparatus in accordance with said Figure 4 and that he had installed it upon the experimental machine. He produced an enlarged drawing illustrating the application of the structure of Figure 4 to the machine, and testified that the permanent or old parts of that machine consisted of the glue pot or glue box, the series of conveying rollers over which the paper was carried, and the calendar rollers by means of which the glue was applied as a making coat to the sheet. There was also, as part of the standard experimental machine, a sand feeding hopper. The witness explained his drawing as showing the adaptation of what he stated to be an embodiment of the structure of said Figure 4 to the standard machine used in the experiment.

The essential parts of Figure 4 as applied to that machine the witness stated to be as follows: " * * * The chamber wall of sheet metal was designed to fit against the sand hopper and also up against —up as close as possible to the sand feed roll to provide the sides of the chambers, which are numbered '44' on Dr. Oglesby's drawing. A steam inlet, No. 50, was also hooked in position somewhat similar to shown on drawing of Figure 4; drip gutters were installed, No. 51; also, a drip pan to catch any condensation, and an outlet under the chamber proper. * * *".

The witness testified that he operated the chamber by supplying dry steam through suitable control valves, the dry steam being obtained by feeding low pressure steam into a gas-fired superheater coil. The witness stated this means for producing dry steam to be a standard satisfactory method. As to the action of the steam, the witness stated as follows: "A. The dry steam was passed through the pipes into the control chamber, and by controlling the amount of flow into that chamber we were able to maintain various partial pressures above the surface of the coated material. The coating procedure was that normally carried out with sandpaper, in that uncoated paper was passed, first, through the calendar rolls and a coat

of glue applied, and then passed into the chamber where the glue coat was conditioned and sand deposited from the sand hopper; passed out of this chamber and using the regular festoon forming equipment which forms part of the whole set-up."

Appellants contended that the machine constructed and used by Waterfield was a different machine from that shown by appellee. In this contention appellants particularly stress the means for producing and the use of superheated or dry steam and the means used to control the atmosphere in the chamber during the operation of the machine by Waterfield.

Based on this record appellants contended that appellee had a disclosure insufficient to entitle him to contest priority of invention of the subject matter of the involved count, and also that the experiment of March 1931 was not in fact a reduction to practice.

The Examiner of Interferences in his decision stated appellee conceded that he would be entitled to prevail only if the experiment performed by him in March 1931 amounted to an actual reduction to practice, for the reason that from the time the experiment was performed until his filing date he did nothing with the invention in issue which could be relied upon to establish anything more than conception. The date of that experiment is earlier than any date sought to be established by appellants and hence the examiner held that if the experiment was to be considered as an actual reduction to practice appellee was entitled to an award of priority.

While the Examiner of Interferences stated, inadvertently we think, that there was nothing in the record to show that appellants had opposed appellee's motion to add the involved count and therefore refused to consider the contention of appellants that appellee could not make the count, nevertheless he pointed out that he believed appellee's application afforded sufficient disclosure of the invention to enable one skilled in the art to make and operate the device of the invention and that such operation "would inherently perform the functional limitations in the count." The Examiner of Interferences further held that the experiment of March 1931 constituted an actual reduction to practice.

The Board of Appeals properly considered the two questions before it to be the readability of the count on the disclosure of appellee, and the experiment of appellee in March 1931 as amounting to a reduction to practice.

Concerning the first question the board held that the count reads upon the disclosure of appellee's application. With respect to the second question the board approved the reasoning of the examiner in all particulars.

An examination of appellee's application clearly shows that he used steam in the device shown in Figure 4. It is stated in the application, with reference to the making of the sizing coat, which is a coat applied to the web after the making coat with the attached granules is dried, that such sizing "is carried out in an atmosphere of steam, preferably dry steam * * *." In the specification the use of steam is disclosed in the operation of the device of Figure 4. This disclosure, in our opinion, must be taken to mean steam suited to the proper functioning of the device. Therefore, we think that the mention of "an atmosphere of steam, preferably dry steam" in connection with the application of the sizing coat would teach one skilled in the art that dry steam would preferably be used in the operation of the device shown in Figure 4.

The control valves, pipes and gas heater coil to produce superheated or dry steam from wet steam are conventional, and their use in the working of the machine by the witness Waterfield we think was the obvious thing to do, and in accordance with the disclosure of the application.

It is contended by appellants that the device used in the experiment is not the device disclosed in the application. We cannot agree with this contention. In our opinion the specification as it relates to the apparatus shown in Figure 4 amply discloses the invention defined by the count. In this respect the specification, omitting reference numerals, reads as follows:

"Referring to Figure 4, an apparatus is disclosed, which is adapted to apply abrasive particles to an adhesively coated backing member, or sheet, in an atmosphere charged with the vapor of a solvent for the adhesive coating. A backing sheet is provided with a coating of adhesive on its upper surface by any appropriate means, not shown, ahead of the supporting roll.

"The coated sheet travels over rolls, into and through an enclosing casing.

Abrasive particles are contained in a hopper and are fed by roll past the adjustable gate to a baffle plate, and thence are deposited upon the adhesively coated backing sheet. A continuously and uniformly flowing shower of abrasive particles is indicated.

"Steam, or the vapor of any other solvent for the adhesive, is admitted to the casing through conduits and serves as a suitable agent effective to resist the formation of air pockets in the manner above described. Any vapor which condenses to liquid form on the walls of the casing is caught by troughs and discharged through conduits. Usually, the abrasive coated backing sheet travels to appropriate drying racks, not shown, after it passes over the roll. In some cases, however, it will be satisfactory to carry the sheet directly from the apparatus of Figure 4 to any one of the forms of apparatus disclosed in Figures 1 to 3, or to an equivalent sizing coat applying machine."

While it is true that the adhesive-applying means is not disclosed, nevertheless such means is conventional. It is obvious that a valve is necessarily used in any feeding of steam and it follows, we think, that a valve will regulate the amount of steam passing through a pipe depending upon the position of the valve gate. We do not believe that there is any substantial difference between the chamber device used in the experiment of March 1931, that shown in Figure 4, and that built and used by the witness Waterfield. We think that the limitations of the involved count fairly read on appellee's disclosure in all respects and, as was held by the Examiner of Interferences, the disclosure is sufficient to enable one skilled in the art to make and operate the device of the invention, and further that such operation "would inherently perform the functional limitations of the count."

It is clear to us that appellee's experiment of March 1931 was an actual reduction to practice.

We have examined the other contentions made by appellants but in view of what has been hereinbefore set out we deem it unnecessary to discuss them.

The decision of the Board of Appeals is affirmed.

Affirmed.